**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**JUAN CARLOS PONCE MENDOZA,**

   **Petitioner,**       **Case No. 2:16-cv-0001**
                **JUDGE GREGORY L. FROST**
**v.**              **Magistrate Judge Terence P. Kemp**

**YURITHZI OLVERA ESQUIVEL.**

   **Respondent.**

<u>**OPINION AND ORDER**</u>

This matter is before the Court for consideration of Petitioner's request to have his children returned to Mexico from the United States pursuant to the 1980 Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), as implemented in the United States by the International Child Abduction Remedies Act, 22 U.S.C. § 9003 *et seq*.  For the reasons that follow, the Court **GRANTS** the petition.

 **I.**   **BACKGROUND**

Petitioner filed a complaint in this matter on January 4, 2016 seeking the return of his children to their hometown in Michoacán, Mexico.  In his complaint, Petitioner alleges that he and Respondent have two minor children together (the "Children").  Petitioner alleges that he and Respondent raised the Children together in Michoacán, Mexico until February 20, 2015, at which time Respondent wrongfully removed the Children from their family home and relocated with them to the United States.

Petitioner asserts that the Hague Convention governs this action.  Because, according to Petitioner, the United States and Mexico are both signatories to the Hague Convention, federal

1

courts in the United States have jurisdiction to decide the merits of a claim that a child was wrongfully removed from Mexico to the United States.

The Court held an evidentiary hearing on Petitioner's claim on April 5, 2016 and April 6, 2016. Petitioner presented two witnesses in support of his case-in-chief: himself (via videoconference) and his brother, Daniel Suarez Mendoza (via deposition designation). The Court summarizes the testimony of these witnesses below.

Petitioner testified that he currently lives in Michoacán, Mexico, in the city of Tuxpan. Petitioner is employed by the municipal government, for whom he plans civic and municipal events. Petitioner previously worked in construction.

Petitioner met Respondent in 2005. They began living together approximately eight days after they met. Petitioner and Respondent never married but had the Children, currently aged 6 and 8 years old, together. Petitioner testified that he is the biological father of both Children.

Petitioner testified about the conditions in which he, Respondent, and the Children lived. They lived in a home along with members of Petitioner's family. The Children had their own bedroom in this home. Both Children attended preschool and received government benefits. Petitioner testified that the Children always had enough to eat and had adequate clothing during this time. The Children received proper medical care and were of average height and weight.

Petitioner helped to buy groceries, took the Children to the park after school, and took them to doctor's appointments when necessary. Petitioner stated that he loved the Children and had a good relationship with them. Petitioner also introduced into evidence several photographs depicting him and the Children interacting or the Children attending various events.

Petitioner testified that, in 2012, Respondent and the Children moved out of the family home and into Respondent's parents' home. Petitioner did not know why they moved out.

Petitioner visited the Children every weekend and sometimes during the week at Respondent's parents' home. Petitioner continued to financially assist the Children during this time.

Petitioner and Respondent signed an agreement before the Municipal Council of Tuxpan (the "Agreement") during the time they lived separately. This Agreement, admitted into evidence as Petitioner's Exhibit 10, sets forth the parties' obligations with respect to raising the Children. The Agreement states that Respondent will care for the Children's health, education, and social development, among other things. The Agreement further states that Petitioner will pay the sum of 800.00 pesos to Respondent biweekly, make the COOPEL payments (which the parties described as a form of payment analogous to a credit card), and cover the Children's medical expenses. Finally, the Agreement states that Petitioner will have the Children on Saturdays and Sundays from 10:00 a.m. to 7:00 p.m.

Petitioner testified that he made the agreed-upon payments to Respondent and that he frequently gave Respondent extra money to care for the Children. The parties agree that Mexican authorities were not made aware of any instances of nonpayment.

At some point after signing the Agreement, in approximately January of 2014, Respondent and the Children moved back into the home they previously shared with Petitioner. Petitioner did not believe that the Agreement reflected the status of their relationship from that point going forward.

Respondent asked Petitioner about moving the Children to the United States. According to Petitioner, Respondent indicated that she would apply for asylum in the United States and that Respondent would come to the United States illegally. Petitioner expressed that he did not wish to come to the United States. Petitioner also expressed that the Children did not have United States visas and that they had never lived outside the state of Michoacán. Petitioner testified that

he never consented to Respondent taking the Children to the United States and that he never indicated to Respondent that he was relinquishing his parental rights at any time.

On February 20, 2015, Respondent and the Children were still living with Petitioner. Petitioner went to work as he usually did.  When he returned home, Respondent and the Children were gone.  Petitioner looked for them and asked Respondents' parents multiple times about Respondent and the Children's whereabouts.

Petitioner eventually learned that Respondent had taken the Children to the United States. At that time, Petitioner contacted a local prosecutor and filed a criminal complaint for kidnapping against Respondent.

Petitioner did not have contact with Respondent until April of 2015 when, according to Respondent, Petitioner called him and demanded that he give her power of attorney over the Children if he ever wanted to have knowledge of the Children's whereabouts.  Petitioner did not speak to Respondent again until after he initiated this lawsuit on January 4, 2016.

Petitioner likewise did not speak to the Children from February of 2015 (when they left Petitioner's home with Respondent) until after January of 2016, at which time the Court granted Petitioner's motion for temporary restraining order.  The Court ordered Respondent not to remove the Children from the Court's jurisdiction and to allow weekly telephone calls between the Children and Petitioner.  Petitioner testified that he has been able to speak to the Children via telephone since this time.

Petitioner testified about his current living situation in Tuxpan.  Recently, Petitioner finished construction on a new home, in which he currently lives.  Petitioner introduced pictures of the home into evidence.

Petitioner also testified about the allegations Respondent made against him during the course of this litigation.  Regarding Respondent's allegations of drug use, Petitioner testified that he has never used illegal drugs, has never sold illegal drugs, and has never been arrested for using or selling drugs.  Petitioner introduced as evidence a document from the Mexican Government stating that he has no criminal history.  Petitioner also introduced as evidence a document showing that he voluntarily submitted to a drug test.  Petitioner emphasized that he does not consume illegal drugs, that no one in his family sells drugs, and that he would not let anyone use or sell drugs around the Children.  Respondent suggested during this litigation that Petitioner's stepfather has a farm on which he grows marijuana; however, Petitioner testified that his stepfather farms only avocados.

Petitioner then addressed Respondent's allegations in her Answer that Petitioner abused her.  Although he acknowledged that the couple had disagreements, Petitioner testified that he never struck Respondent during an argument.  Petitioner testified that he has never been convicted of any crime of violence or domestic violence.  Petitioner also noted that Respondent did not accuse Petitioner of physical abuse at the time they entered into the Agreement.

Petitioner denied Respondent's allegations that Tuxpan is not a safe place to live.  According to Petitioner, Tuxpan is very safe.  Kids play outside and can walk to neighborhood stores by themselves.  Petitioner is not aware of any violent crime in Tuxpan and testified that he would not request return of the Children to that area if he did not think it was safe.  To that end, Petitioner introduced into evidence a document signed by Michoacán's manager of public safety stating that there have been no instances of high-impact offenses such as organized crime, kidnapping, and homicides in Tuxpan since the year 2011.  Petitioner testified that the individual who signed this document works for the state government (as opposed to the municipal

government, where Petitioner works), and that Petitioner did not pay any money to obtain this document.  Petitioner also testified that, although Tuxpan is not free from violence, he agrees with the statements set forth in the document.

On cross-examination, Petitioner testified that he has one other child from a previous relationship.  Petitioner verbally agreed for that child to go to the United States; the child currently lives in Cleveland, Ohio.  Petitioner testified that he lost touch with the child several years ago.

Petitioner also answered questions about his alleged arguments with Respondent. Petitioner denied striking Respondent, putting his hands around her neck, and infecting her with a sexually transmitted disease.  Petitioner testified that the Children were not present when he and Respondent argued because they were either asleep or at school.

In concluding his testimony, Petitioner testified that it would mean a lot to him if the Children were returned to Tuxpan.  Petitioner testified that, if the Children are returned to Mexico without Respondent, he would allow the Children to have telephone contact with Respondent.  Petitioner also testified that, if Respondent and the Children return to Mexico, he is willing to work out a reasonable custody arrangement with Respondent.

 Petitioner next presented the testimony of Daniel Suarez Mendoza via deposition designation.  Mr. Mendoza is Petitioner's seventeen-year-old brother.  Prior to February 20, 2105, Mr. Mendoza lived in his parents' house along with Petitioner, Respondent, and the Children (excluding the periods of time in which Respondent and the Children moved out of the home).

Mr. Mendoza testified that his father (who is Petitioner's stepfather) grows avocados and does not cultivate drugs.  Mr. Mendoza also testified that the neighborhood in which the family

lives is a safe place in which children can play outside.  Mr. Mendoza does not know of any drug-related violence in his neighborhood.

Mr. Mendoza stated that he believes Petitioner had a good relationship with the Children prior to their removal.  Mr. Mendoza saw Petitioner take care of the Children, take them to school, take them to the park, and buy them clothes and food.

Mr. Mendoza did not hear Respondent express concern that the Children did not have enough food.  He did not see Petitioner become violent with Respondent.  Mr. Mendoza also testified that Petitioner does not use or sell drugs and never has.

Mr. Mendoza never heard Respondent say anything about wanting to move to the United States.  Mr. Mendoza was, however, home on the day that Respondent and the Children left Tuxpan for the United States.  Mr. Mendoza saw one of the Children crying but Respondent did not allow the child to tell Mr. Mendoza what was wrong.  When Mr. Mendoza told Petitioner later that day that Respondent had left the home with the Children, Petitioner started crying.  Mr. Mendoza stated that, if the Children return to Mexico, his family would welcome them home.

Petitioner rested his case with the presentation of Mr. Mendoza's testimony.  Respondent then presented herself as a witness.

Respondent testified that, shortly after she got together with Petitioner, he and members of his family sold drugs.  Respondent testified that she witnessed Petitioner using drugs. Respondent further testified that Petitioner's stepfather grows and sells marijuana.  Respondent acknowledged that Petitioner eventually began working for the government and that she does not know whether he still sells drugs.

Respondent testified that Petitioner mistreated her.  Respondent stated that Petitioner would push and grab her.  Petitioner did not mistreat the Children; however, the Children were

7

present when Petitioner would yell at Respondent.  Respondent testified that she was always fearful of Petitioner.  In one specific incident, Petitioner took Respondent to a hill and said that they would go over the cliff together if she ever left him.  Respondent believed this threat and noted that Petitioner suffers from a nervous or anxiety disorder.

Respondent testified that, contrary to Petitioner's testimony, he gave her the sexually transmitted disease human papilloma virus.  Respondent confronted Petitioner about giving her the disease and the two argued.

Respondent confirmed during her testimony that she did not tell Petitioner that she was taking the Children to the United States.  She did not tell Petitioner because she knew he would not permit it.

Respondent testified that Tuxpan was not a safe place to live at the time she took the Children to the United States.  Respondent and the Children once saw two armed men take another man and put him into a truck.  The man lived in the neighborhood where Respondent, Petitioner, and the Children were living.  The man was killed and his body parts were delivered to his mother.   Respondent added that she does not believe the government report that Petitioner introduced into evidence because many incidents do not get reported and one can pay people in government positions to do or say anything.

Respondent feels less safe returning to Tuxpan now that she has made comments about Petitioner's family.  She testified that "you can imagine" what might happen to her or the Children.

Respondent next testified about her life in the United States.  Upon entering the country, Respondent applied for permission to legally reside in the United States.  Respondent enrolled the Children in school and attended to their medical needs.

On cross-examination, Respondent confirmed that she and the Children lived with Petitioner from the Children's births until the time they left for the United States, excluding two short separations.  Respondent also confirmed that she moved back into Petitioner's family home at some point after she and Petitioner entered into the Agreement.

Respondent testified during cross-examination that no one witnessed any physical altercations between herself and Petitioner.  She never went to the hospital for injuries Petitioner inflicted upon her, never called the police, and never sought social services as a victim of domestic violence.  The first time Respondent alleged physical violence was when she came to the United States with the Children in 2015.

Respondent also answered questions about a statement she made to Mexican authorities in 2012 that, according to her, was intended to create a record of why she left Petitioner's home.  Respondent acknowledged that, in the statement, she told Mexican authorities that she left Petitioner's home because he verbally mistreated her, had a picture of another woman on his phone, and did not let her claim a prize for a contest she entered and won.  Respondent did not state at that time that Petitioner physically abused her.

Regarding the alleged violence in Tuxpan, Respondent acknowledged that she let the Children walk to school, walk to a neighborhood store, and play outside when they lived there. She was not aware of any government records documenting the violence to which she testified. Although Respondent was aware that the United States issued a travel alert for citizens seeking to travel to Michoacán, she was not aware that the United States also issued a travel alert for citizens seeking to travel to the continent of Europe.

Regarding Petitioner's alleged drug use, Respondent could not remember the last time she saw him use cocaine.  She acknowledges that the last time she saw Petitioner use drugs was

before she signed the Agreement in 2012.  Because she has not seen Petitioner in over a year, Respondent could not say whether he currently uses illegal drugs.

Respondent concluded her testimony by discussing her attempt to obtain asylum in the United States.  She acknowledged that a United States immigration judge denied her application for asylum.  She also acknowledged that, if her appeal of the immigration judge's decision is denied, she will have to return to Mexico.

Respondent then presented the testimony of Juan Jose Olvera Esquivel.  Mr. Olvera Esquivel testified that he is Respondent's sister.  Respondent and the Children currently live in Mr. Olvera Esquivel's home in the United States.  Mr. Olvera Esquivel testified that the Children have been receiving excellent care, that they currently go to school, and that they go to the doctor when necessary.

Mr. Olvera Esquivel used to live in Michoacán, Mexico, before moving to the United States in 2007.  While in Mexico, Mr. Olvera Esquivel was a victim of violence in that members of the Zeta Group beat him up.  Mr. Olvera Esquivel testified that members of the group would take cars away from people and collect money from shops before allowing the shops to do business in the area.  Mr. Olvera Esquivel did not believe that Michoacán, Mexico, was safe at the time he lived there.  Mr. Olvera Esquivel also testified that he has never spoken to Petitioner. With that testimony and closing arguments, the evidentiary hearing concluded.

The Court now proceeds to analyze Petitioner's request to have the Children returned to Mexico pursuant to the terms of the Hague Convention.

## II.    ANALYSIS

### A.    Standard of Review – Prima Facie Case

The following preliminary principles guide the Court's analysis:

The purpose of the Hague Convention is to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence...."  Hague Convention, Preamble.  The Convention seeks to "restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996) ("*Friedrich II*"). Additionally, according to the official commentary on the Hague Convention, the Convention should be read to prevent a circumstance where "the child is taken out of the family and social environment in which its life has developed." Elisa Perez–Vera, Explanatory Report ¶ 12, in 3 *Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction* 1069 (1982) ( "Perez–Vera Report").

When faced with a petition for return of a child under the Hague Convention, the courts of signatory nations may only determine the merits of the abduction claim; the merits of the underlying custody claim are not to be considered. Hague Convention, Article 19; *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993).  . . .

Under the Hague Convention, **the removal of a child from one nation to another is considered wrongful when**:

a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, Article 3.

*Robert v. Tesson*, 507 F.3d 981, 988 (6th Cir. 2007) (emphasis added).  "The Convention shall cease to apply when the child attains the age of 16 years."  Hague Convention, Article 4.

Notably,

[i]n ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.

*Id*. at Article 14.

The United States Congress has codified statutes implementing the Hague Convention and providing jurisdiction to federal district courts.  Pursuant to 22 U.S.C. § 9003(b),

> Any person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

A petitioner seeking the return of a child under § 9003(b) must prove, be a preponderance of the evidence, that:

> (A) in the case of an action for the return of a child, that the child has been wrongfully removed or retained within the meaning of the Convention; and
>
> (B) in the case of an action for arrangements for organizing or securing the effective exercise of rights of access, that the petitioner has such rights.

*Id*. § 9003(e)(1).  *See also Tesson*, 507 F.3d at 993–94; *Friedrich II*, 78 F.3d at 1064.

### B.       Standard of Review – Affirmative Defenses

"Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."  22 U.S.C. § 9001(a)(4).  A respondent can successfully oppose the return of a child by proving that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation" or that return "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."  Hague Convention, Article 13(b), Article 20.  The respondent bears the burden of proving these defenses by clear and convincing evidence.  22 U.S.C. § 9003(e)(2)(A).

The respondent also can successfully oppose the return of a child by proving that (1) more than one year has elapsed between the wrongful removal and the commencement of the litigation and the child is now settled in his or her new environment, (2) the person seeking return of the child "was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention, or (3) "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Hague Convention, Article 12–13.  Unlike the Article 13(b) and Article 20 defenses, a respondent need only prove these defenses by a preponderance of the evidence.  22 U.S.C. § 9003(e)(2)(B).

### C.  Petitioner's Prima Facie Case

Here, it is undisputed that the Children are under sixteen years of age and that both the United States and Mexico are signatories to the Hague Convention.  Petitioner brings this action pursuant to § 9003(e)(1)(A) for return of the Children to Mexico.[1]

To establish his prima facie case under § 9003(e)(1)(A), Petitioner must prove that the Children were wrongfully removed from Mexico in violation of the Hague Convention. Petitioner therefore must prove that the Children were habitually present in Mexico immediately prior their removal, that the removal breached custody rights provided to Petitioner under Mexican law, and that Petitioner was exercising his custody rights at the time of removal.  *See* Hague Convention Article 3.

Although the Hague Convention does not define "habitual residence," the Sixth Circuit has held that "a child's habitual residence is the place where he or she has been physically

---

[1] Respondent's attempt in her counsel's closing argument to characterize this action as one for organizing or securing the effective exercise of rights of access pursuant to § 9003(e)(1)(B) has no basis in fact.  *See* ECF No. 2 (setting forth Petitioner's request for the return of the Children to Mexico).  To the extent Respondent made this argument to suggest that Petitioner only had rights of access and not custody rights at the time of the Children's removal, the Court will address this argument in its analysis of whether Petitioner had and was exercising custody rights such that Respondent's removal of the Children was wrongful.

13

present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Panteleris v. Panteleris*, 601 F. App'x 345, 349 (6th Cir. 2015) (quoting *Robert*, 507 F.3d at 998). The Court must consider five principles in determining a child's habitual residence:

> First, habitual residence should not be determined through the technical rules governing legal residence or common law domicile. Instead, courts should look closely at the facts and circumstances of each case. Second, because the Hague Convention is concerned with the habitual residence of the child, the court should consider only the child's experience in determining habitual residence. Third, this inquiry should focus exclusively on the child's past experience. Any future plans that the parents may have are irrelevant to our inquiry. Fourth, a person can have only one habitual residence. Finally, a child's habitual residence is not determined by the nationality of the child's primary care-giver. Only a change in geography and the passage of time may combine to establish a new habitual residence.

*Id.* (quoting *Robert*, 507 F.3d at 998).

Here, the Court easily concludes that the Children were habitual residents of Mexico prior to their removal. Petitioner testified that the Children were born in Michoacán, Mexico and had never lived outside of Michoacán, Mexico prior to their removal to the United States. Respondent's testimony concedes this fact. The Children attended school in Mexico, received health care there, and have extended family there (with whom they lived for a majority of their lives). There is no evidence that the Children had any meaningful connection to any other country prior to their removal from Mexico. Petitioner therefore satisfies the first element of his prima facie case.

Petitioner likewise satisfies the second element of his prima facie case. Mexican law grants custodial rights to a child's biological parents, regardless of whether the parents are married. *See, e.g.,* Federal Civil Code of Mexico Article 414 ("Parental authority over children shall be exercised by the parents") (translated version introduced as Petitioner's Exhibit 29); Michoacán Family Code Article 391 ("As long as the child is under parental authority/

14

responsibility (patria potestas) over the children will be exerted . . . [b]y the father and mother" )

(translated version introduced as Petitioner's Exhibit 28).  Removal of the child from the parental

home without the parents' permission and/or a judicial decree violates those rights.  *See* Federal

Civil Code of Mexico Article 421 ("While the child is under parental control, he will not be able

to leave the home belonging to those exercising it, without their permission or a decree from the

authority with jurisdiction.") (translated version introduced as Petitioner's Exhibit 29).

Petitioner presented undisputed testimony that he is the Children's biological father.  The

rights of custody referenced in Article 3 of the Hague Convention therefore arise by operation of

Mexican law.

The third element of Petitioner's prima facie case is, as stated above, that Petitioner was

exercising his custodial rights at the time of the Children's removal.  The Sixth Circuit has

stated: "[I]n the absence of a ruling from a court in the country of habitual residence, [courts are]

to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep,

any sort of regular contact with his or her child."  *Friedrich II*, 78 F.3d at 1065.  The court

rationalized that such a broad definition is necessary because "an American decision about the

adequacy of one parent's exercise of custody rights is dangerously close to forbidden territory:

the merits of the custody dispute."  *Id.*  The court concluded: "if a person has valid custody rights

to a child under the law of the country of the child's habitual residence, that person cannot fail to

'exercise' those custody rights under the Hague Convention short of acts that constitute clear and

unequivocal abandonment of the child."  *Id*. at 1066.

Here, there is no evidence that a Mexican court has ruled that Petitioner was not

exercising custody rights over the Children at the time of their removal.  The question therefore

is whether Petitioner clearly and unequivocally abandoned the Children prior to their removal.

Having considered the evidence and the parties' arguments, the Court agrees with Petitioner that there has been no such abandonment. The undisputed testimony shows that the Children were living with Petitioner at the time of their removal, that Petitioner shared financial responsibility for the Children's well-being, that Petitioner took at least one of the Children to school each day, that Petitioner occasionally took the Children to the park to play, and that Petitioner played a role in taking the Children to obtain medical care when necessary, among other things. Petitioner therefore satisfies his burden in proving that he was exercising his custodial rights at the time the Children were removed to the United States.

To the extent Respondent attempted to suggest in her testimony or in her counsel's oral arguments that Petitioner abandoned his custodial rights by signing the Agreement, any such argument fails. Even if the Agreement governed the parties' relationship at the time of the Children's removal from Mexico in 2015, which is doubtful given that Respondent and the Children had moved back into Petitioner's home at that point, the Agreement does not evince clear and unequivocal abandonment of the Children. To the contrary, the Agreement states that Petitioner will care for the Children on weekends and financially contribute to their care. The Agreement reflects, in other words, Petitioner's desire to remain involved in the Children's lives despite the fact that Respondent had moved them out of Petitioner's home. The Agreement therefore does not negate the Court's finding that Petitioner was exercising his custodial rights at the time of the Children's removal to the United States.

Given these findings, the Court concludes that Petitioner has established his prima facie case for wrongful removal pursuant to Article 3 of the Hague Convention. The Court proceeds to analyze whether Respondent has established any of the recognized defenses set forth above.

D.     *Respondent's Defenses*

The Court notes at the outset that, of the five recognized defenses to a Hague Convention action, four are not at issue in this case.  It is undisputed that Petitioner initiated this lawsuit within one year of the Children's removal from Mexico such that the defense set forth in Article 12 of the Hague Convention does not apply.  It likewise is undisputed that Petitioner did not consent or acquiesce in the Children's removal or retention in the United States.  Indeed, Respondent acknowledged in her testimony that Petitioner expressed that he did not wish to relocate the Children to the United States and that she did not tell Petitioner about her plan to relocate the Children to the United States because she knew he would not agree.  The defense set forth in Article 13(a) of the Hague Convention therefore does not apply.

The "mature child" exception set forth in Hague Convention Article 13 also is not at issue in this case.  As the Court stated in its April 4, 2016 Order granting Petitioner's motion *in limine*, Respondent waived the right to pursue any such defense by not naming either of the Children on her witness list and subsequently refusing to make the eldest child available for a deposition.  The Court stated: "any attempt to introduce the child's wishes through means other than calling the child as a witness would amount to inadmissible hearsay to which no exception applies."  (ECF No. 35, at PAGEID # 290.)  Respondent did not take any action at the April 5, 2016 hearing that justifies modification of that order.

Finally, the Article 20 defense that "return . . . would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," likewise is not at issue in this case.  Respondent made no attempt to invoke this defense or otherwise explain why this defense is satisfied here.

The Court therefore is left with the defense set forth in Hague Convention Article 13(b) that returning the Children to Mexico poses a grave risk of physical or psychological harm or would otherwise place the Children in an intolerable situation.  As stated above, Respondent bears the burden of establishing this defense by clear and convincing evidence.

The Sixth Circuit has emphasized that the Article 13(b) defense is not an invitation for courts to "speculate on where the child would be happiest."  *Friedrich II*, 78 F.3d at 1068.  "That decision is a custody matter, and reserved to the court in the country of habitual residence."  *Id*. The court went on to state:

> [W]e believe that a grave risk of harm for the purposes of the Convention can exist in only two situations. First, there is a grave risk of harm when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute—*e.g.,* returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Id*.  In determining whether a grave risk of harm exists, "a court should primarily focus on the time period between repatriation and the determination of custody by the courts in the child's homeland."  *Simcox v. Simcox*, 511 F.3d 594, 607 (6th Cir. 2007).

The Sixth Circuit has made clear that allegations of abuse—standing alone—do not necessarily satisfy Article 13(b).  To the contrary,

> Hague Convention cases dealing with abusive situations can be placed into three broad categories. First, there are cases in which the abuse is relatively minor. In such cases it is unlikely that the risk of harm caused by return of the child will rise to the level of a "*grave* risk" or otherwise place the child in an "*intolerable* situation" under Article 13b. In these cases, undertakings designed to protect the child are largely irrelevant; since the Article 13b threshold has not been met, the court has no discretion to refuse to order return, with or without undertakings. Second, at the other end of the spectrum, there are cases in which the risk of harm is clearly grave, such as where there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect. . . . In these cases, undertakings will likely be insufficient to ameliorate the risk of

harm, given the difficulty of enforcement and the likelihood that a serially abusive petitioner will not be deterred by a foreign court's orders. Consequently, unless "the rendering court [can] satisfy itself that the children will in fact, and not just in legal theory, be protected if returned to their abuser's custody" . . . the court should refuse to grant the petition. Third, there are those cases that fall somewhere in the middle, where the abuse is substantially more than minor, but is less obviously intolerable. Whether, in these cases, the return of the child would subject it to a "grave risk" of harm or otherwise place it in an "intolerable situation" is a fact-intensive inquiry that depends on careful consideration of several factors, including the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return. Even in this middle category, undertakings should be adopted only where the court satisfies itself that the parties are likely to obey them. Thus, undertakings would be particularly inappropriate, for example, in cases where the petitioner has a history of ignoring court orders. . . . Where a grave risk of harm has been established, ordering return with feckless undertakings is worse than not ordering it at all.

*Id*. (internal citations omitted).  In *Simcox*, for example, the court found that the evidence "fit[] in the middle category" when the respondent proved that the petitioner physically abused her in the children's presence and a psychologist who examined the children found that they were suffering from some level of post-traumatic stress syndrome.  511 F. 3d at 608–09.

Here, Respondent undoubtedly is a sympathetic witness.  She testified earnestly that she fears for the Children's safety should they be returned to Mexico following her allegations that Petitioner's family is involved in the drug business.  She further testified that Respondent used physical force on her at times and threatened both of their lives if she ever attempted to leave him.  The Court acknowledges the gravity of these accusations.

The Court finds, however, that Respondent fails to establish the Article 13(b) defense by clear and convincing evidence.  Respondent presented no evidence that the Children are aware of any incidents of abuse or Petitioner's prior alleged drug use.  Respondent did not allege that Petitioner ever abused (either physically or verbally) the Children themselves or ever used drugs in their presence.  And the facts that Respondent never filed a police report, received medical

care, sought social services, or took other action to document the alleged abuse weighs against a finding that any abuse exceeded the "relatively minor" category set forth in *Simcox*.  As such, although the Court is sympathetic to Respondent's plight, it cannot conclude that the allegations of abuse and/or prior drug use present a risk of harm so grave that the Mexican courts should be stripped of their authority to decide the merits of this custody dispute.

Respondent likewise fails to meet her burden in proving that Michoacán, Mexico is a zone of war, famine, or disease.  The discrete examples of violence to which Respondent testified—while disturbing—are insufficient to prove that the country of Mexico or the state of Michoacán pose a grave risk of harm to the Children upon their return.  Respondent did not, for example, provide any evidence comparing the crime rates in Michoacán to those in Columbus, Ohio, or explain why the Children face a greater risk of violence in Mexico than they face in the United States.  The fact that the United States has issued a travel warning to citizens traveling to Michoacán, Mexico is insufficient to establish that Michoacán, Mexico is a war zone.  And Respondent's counsel's statements during closing argument that it is "well-documented" in the media that cartel violence in Mexico has turned the country into a war zone is not clear and convincing evidence of the same.

The Court accordingly concludes that Respondent fails to meet her burden in proving that any of the defenses set forth in the Hague Convention apply to the facts of this case.  Return of the Children to Mexico, therefore, is warranted.  The Mexican judiciary is best equipped to address Respondent's allegations and make a custodial determination regarding the Children's best interests.

### III.     CONCLUSION

For the foregoing reasons, Petitioner's petition is **GRANTED**.  The Court **DIRECTS** the Clerk to enter judgment in Petitioner's favor and remove this case from the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

The Court further **DIRECTS** Respondent to take all appropriate steps to ensure that the Children are returned to Mexico within thirty (30) days of the date of this Opinion and Order. Respondent may personally return the Children to Mexico or place the Children in Petitioner's custody to be returned.  The Children may not be placed into the care or control of a third party for their return to Mexico without the Court's express permission.  Pending their return to Mexico, the Children shall not—absent leave of the Court—be removed from the jurisdiction of the United States District Court for the Southern District of Ohio for any purpose other than to effect their return.  Counsel for Respondent shall file a notice with the Clerk of Court immediately upon the Children's arrival in Mexico indicating that Respondent has complied with the terms of this Opinion and Order. The parties are admonished that the willful failure to comply with the terms of this Opinion and Order shall constitute contempt of court and may result in the imposition of a fine and/or imprisonment.

**IT IS SO ORDERED**.

> **/s/ Gregory L. Frost**
> **GREGORY L. FROST**
> **UNITED STATES DISTRICT JUDGE**